# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 16-564


MARY O'NEAL, ET AL.

VERSUS

RONNIE NEWCOMB


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 249,989
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and John E. Conery, Judges.

### REVERSED AND REMANDED WITH INSTRUCTIONS.

**Charles David Elliott**
**Charles Elliott & Associates, LLC**
**720 Murray Street**
**Alexandria, LA 71301**
**Telephone: (318) 704-6511**
**COUNSEL FOR:**
**Defendant/Appellee - Ronnie Newcomb**

**Brandy McClure**
**P. O. Box 665**
**Jonesville, LA 71343**
**Telephone: (318) 339-7337**
**COUNSEL FOR:**
**Plaintiffs/Appellants - Mary O'Neal, Donald L. O'Neal, Tommy Joe McClure, and Julia T. McClure**

**THIBODEAUX, Chief Judge.**

In this boundary dispute, the plaintiffs, siblings Mary and Donald O'Neal, and husband and wife Tommy and Julia McClure, appeal judgments in favor of the defendant, Ronnie Newcomb. Finding that the judgment of the trial court was contrary to the law and evidence at trial, we reverse the judgment in favor of the defendant and order that a new trial be granted to the plaintiffs.

I.

## ISSUES

We must decide:

(1) whether the trial court erred or was clearly wrong in finding that the plaintiffs failed to prove possession of the disputed acreage by acquisitive prescription;

(2) whether the trial court manifestly erred in finding that the boundary lines in the defendant's title were correct; and

(3) whether the trial court manifestly erred in denying the plaintiffs' motion for a new trial.

II.

## FACTS AND PROCEDURAL HISTORY

Siblings Mary and Donald O'Neal, as the only children and heirs of Robert E. Lee O'Neal (sometimes referred to as "Robert"), inherited two parcels of land, totaling approximately 55.00 acres, in Rapides Parish, which Robert acquired from Joseph Adam O'Neal (sometimes referred to as "Joseph") in 1936. Donald was seventy-three years old at the time of trial and had lived on the property since birth. Mary lived on the property most of her life as well. In 1960, Robert fenced a portion of his property as a means of marking the boundary between his land and

the 20.73 neighboring acres which Joseph sold to Leonard O'Neal in 1937. In 2012, Mary and Donald donated the 55.00 acres to Tommy and Julia McClure (sometimes referred to as the "McClures"), but Mary and Donald reserved a lifetime usufruct over the property for themselves. The 20.73 neighboring acres from Leonard's side of the O'Neal family came into ownership by Dusty and Kristin Gardner in 2012, and then by Dusty Gardner alone, pursuant to a property settlement in 2014. Gardner made it known that he was claiming a small portion of the fenced property as his own.

In April 2014, Mary and Donald O'Neal, and Tommy and Julia McClure, jointly filed a petition to fix the boundary along the fence-line, asserting that they and their ancestors in title had been in quiet, uninterrupted possession of the property to the fence-line for over thirty years.

Four months before trial, in May 2015, Gardner sold the 20.73 acres to Ronnie Newcomb, and Newcomb was substituted as the defendant in the suit. Following trial, judgment was rendered in December 2015 in favor of Newcomb, stating that Newcomb was the record title owner of the land and legal boundaries in his title. The judgment effectively set the boundaries according to Newcomb's title, the validity of which was strenuously disputed at trial. The plaintiffs' motion for a new trial based upon La.Code Civ.P. art. 1972(1), asserting that the judgment was contrary to the law and to the evidence at trial, was denied.

The plaintiffs' motion for appeal cited the December 30, 2015 judgment and the March 28, 2016 judgment and sought to appeal the final judgment of the trial court. The order of appeal listed the December 2015 judgment, but the notice of appeal sent out by the court granted an appeal from the March 2016 judgment. It is clear that the appeal was requested and granted as to

2

both the original judgment and the judgment denying a new trial, and we will review both.

III.

## STANDARDS OF REVIEW

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Whether a party has possessed property for purposes of thirty-year acquisitive prescription is a factual determination subject to the clearly wrong standard of review. *Phillips v. Fisher*, 93-928 (La.App. 3rd Cir. 3/2/94), 634 So.2d 1305, *writ denied*, 94-813 (La. 5/6/94), 637 So.2d 1056. A boundary location is a question of fact subject to a manifest error standard of review. *Bowman v. Blankenship*, 34,558 (La.App. 2 Cir. 4/4/01), 785 So.2d 134, *writ denied*, 01-1354 (La. 6/22/01), 794 So.2d 794. Errors of law are reviewed de novo. *Land v. Vidrine*, 10-1342 (La. 3/15/11), 62 So.3d 36.

IV.

## LAW AND DISCUSSION

The plaintiffs contend that the trial court manifestly erred in its finding that Ronnie Newcomb is the owner of the disputed acreage and that legal boundaries are set by his title because his title contains errors. We agree with the plaintiffs. The record reveals that the plaintiffs proved uninterrupted possession of the 55.00 acres owned by their ancestors in title since 1936, as well as a small portion inside a fence they erected in 1960. We find that the defendant's 2015 title, while stating that it is the same 20.73 acres surveyed in 1908 and acquired by

3

Newcomb's ancestor in title, Leonard O'Neal, in 1937, does not comport with the description in the 1908 survey or in the description in Leonard's 1937 title. We also find that, because the trial court's judgment is contrary to the law and evidence, the plaintiffs are entitled to a new trial.

More specifically, there were two lines of succession of two contiguous pieces of property owned by two brothers in 1908. They requested and obtained a survey plat of their properties in 1908 which shows that David O'Neal owned 20.73 acres, and Joseph Adam O'Neal owned approximately 55.00 acres that wrapped around David's land on two sides. The separating boundary on those two sides was a bayou called the Lamentine or "Lemontine Branch." Both pieces of property stopped, side by side, so to speak, at the "Public Road" marked on the 1908 plat by dotted lines. Thus, the Public Road was the boundary on one end for both pieces of property. As will be discussed later in this opinion, Ronnie Newcomb's title was stringently disputed at trial because it changes the description of the boundary from the "Public Road" to a state highway, as testified to by surveyor Jared Couvillion. Mr. Couvillion testified unequivocally and repeatedly that the Public Road shown as the northern boundary of the properties, represented by a dotted line on the 1908 survey plat, was a buggy axle road, and was not the same as Highway 57 or Highway 28:

> [PLAINTIFFS' COUNSEL]: Okay. You have discussed the public road that is in that nineteen oh-eight survey, correct?
>
> A. Yes.
>
> Q. And you've also mentioned Highway 57 in a property description, correct?
>
> A. Yes.

4

Q. Okay. Are those the same roads?

A. No.

Q. Okay. What's the difference?

A. Highway 57 would be, in my opinion, where 28 is today. And that the old public road was really more or less a buggy axle road.

. . . .

Q. So it's your testimony - did Highway 57 move?

A. No.

Q. All right. So Highway 57 and Highway 28 are the same highway?

A. Yes.

Q. But the public road that's made reference to in the nineteen oh-eight deed is different? That's the public road, that's not a state highway?

A. Yes.

The 1908 survey plat in the record shows that both brothers' properties ran lengthwise, side by side, from (and perpendicular to) the Public Road located near the top of the Southwest Quarter (SW ¼) of the Northeast Quarter (NE ¼) of Section 10, down into the Northwest Quarter (NW ¼) of the Southeast Quarter (SE ¼) of Section 10 (in Township 5 North, Range 3 East). The plat also shows that a small piece of Joseph's property extended into the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼) of Section 10.[1]

_____

[1]A Township contains 36 square miles and is divided into 36 Sections; each Section contains one square mile, or 640 acres. Each Section is divided into quarters containing 160 acres each. Each Quarter is then subdivided into Quarters containing 40 acres each. The location of a piece of property within a forty-acre Quarter of a Quarter is sometimes expressed by separating the designations with a comma. Thus, Joseph A. O'Neal and David O'Neal both owned property in the Southwest Quarter of the Northeast Quarter (SW ¼, NE ¼) and the Northwest Quarter of the Southeast Quarter (NW ¼, SE ¼) of Section 10; and a small portion of

At some point in time before 1936, Joseph acquired David's 20.73 acres. In 1936, Joseph sold the 20.73 acres to Leonard O'Neal; and in 1937 he sold his approximately 55.00 acres to Robert E. Lee O'Neal. Ronnie Newcomb purchased the 20.73 acres in 2015. The heirs of Robert E. Lee O'Neal, his only two children, the plaintiffs Mary and Donald O'Neal, kept the 55.00 acres, with Donald living on the property continuously since his birth in 1942; Mary has lived there most of her life as well. These facts are undisputed. In 2012, Donald and Mary executed an act of donation of the land in favor of the McClures but retained a lifetime usufruct over the property.

Donald testified that he helped his father build a fence in 1960 to mark the boundaries between the land, and that he continued to run cows, plant corn, and bush-hog the land to the fence, maintaining the fence-line continuously after his father died in 1975. Donald and Mary O'Neal did not open a succession after their father died, and thus did not have a title to the 55.00 acres in their own names. Donald and Mary testified that at no time were they interrupted or disturbed in their possession of the land to the fence-line from the day it was built in 1960.

Donald O'Neal testified as to the location of the fence and its purpose:

Q. And where is that fence?

A. Right in the front of the property that Mr. Newcomb claims he owns.

Q. Okay. And when was that fence built?

A. In nineteen sixty.

Q. And did you help build that fence?

---

Joseph's property extended into the Northeast Quarter of the Southwest Quarter (NE ¼, SW ¼) of Section 10.

6

A.  I did.

Q.  And what was the fence used for?

A.  Keep livestock in.  But it's also the property line.

Q  It's the property line?

A.  Mm-hmm (Yes).

. . . .

Q.  And you didn't have to ask permission?

A.  No.

Q.  You openly ran your cows on that property?

A.  Right.

Q.  Okay.  Did you ever farm it or anything?

A.  There's been corn planted on it.

Q.  To the fence?

A.  Yeah.

Q.  So the fence - you testified that the fence goes on the north - tell me where the fence is again?

A.  It's on the north side of Highway - the old wagon road.

Donald O'Neal testified that he had lived on the property all his life and received and paid tax bills on it without opening a succession after his father died in 1975.  Mary O'Neal testified that she had lived on the property for seventy-five years, confirmed that they asserted ownership of the property to the fence-line by running cattle and horses, and that they paid the taxes on the property.

Tommy McClure testified as naked owner of the 55.00 acres of property donated to him and his wife by Mary and Donald O'Neal in 2012.

Q.  And on this property, is there a fence?

A. Yeah.

Q. And where is the fence?

A. Around the boundaries of it. It goes down 28 and goes over to the Sanson property, turns south six and a half chains. Then goes back east across Lemontine Branch, then goes south. Then goes back west, goes south again, back east and comes back up north to 28.

Q. And since you've been a naked owner of the property, how have you asserted ownership?

. . . .

A. I have run cattle on the place and kept the fence up.

Q. And you ran the cattle to the fence?

A. Yeah to the fence. Correct.

Q. Okay. And has anybody interrupted your possession of the property?

A. Not until Ronnie called one evening about - he claimed he was going to buy the place and he was claiming across the Lemontine Branch as his. And I told him that the fence had been there for probably a hundred years. And that, you know, it was Donald and Mary's and then they give it to us. It wasn't – it's never been you know, nothing – nobody's ever tried possessing it till Ronnie. Well, Dusty Gardner wrote the letter first?

Mr. McClure then testified that the fence was visible and easily seen. He stated that he still maintained the fence built in 1960, and that he pulled a "little hot fence" in front of it to keep the cattle in.

The 1937 deed from Joseph A. O'Neal to Robert E. Lee O'Neal describes the two tracts making up the 55.00 acres as follows:

TRACT ONE:

A certain piece or lot of ground, lying and being situated in the Parish of Rapides, Louisiana, and being all of the Northwest Quarter of the Southeast Quarter of Section Ten (10) Township 5 North, Range 3 East, Louisiana

8

Mer. Lying South and West of the Lemontine Branch, and a strip about two and three tenths chains wide on the Eastern portion of the Northeast Quarter of the Southwest Quarter of Section 10, Township 5 North, Range 3 East, and lying South all together and bounded North and East by Lemontine branch and South by William O'Neal, and West by vendor Ishmael[] Tarver, being twenty acres, more or less.

TRACT TWO:

A certain piece or parcel of land, lying and being situated in the Parish of Rapides, Louisiana. And being the Southwest Quarter of the Northeast Quarter and part of the Northwest Quarter of the Southeast Quarter of Section Ten (10), Township 5 North, Range 3 East, and being part of the land purchased by this vendor from L.L&E. O Red, as per deed of record in the Conveyance Book L, Page 491, and being a portion of said purchased which lies East of the North and South prong of the Lemontine branch and South of Public Road. Containing thirty-five (35) acres, more or less.

The actual area in dispute appears to be less than three acres and located in Tract Two above. The 2012 act of donation contains the same description as the 1937 deed above. Based upon the 1908 survey plat, the 1937 deed from Joseph O'Neal to Robert E. Lee O'Neal, and the 2012 donation from Mary and Donald O'Neal to Tommy and Julie McClure, the plaintiffs and their ancestors in title have occupied and have had corporeal possession of the same property since 1908. The plaintiffs, and their ancestor Robert E. Lee O'Neal, thought the fence they built in 1960 marked the real boundaries of the titled property. Thus, Robert E. Lee O'Neal possessed *as owner*, the property to the fence-line from 1960 until his death in 1975. His children and only heirs, Mary and Donald O'Neal, possessed *as owners* the property to the fence-line from 1975 until 2012, when they retained usufruct but donated the property to the McClures.

As the applicable law below demonstrates, Mary and Donald O'Neal are universal successors of Robert E. Lee O'Neal, and they acquired ownership of the property at the moment of Robert's death in 1975. Thus, their possession tacked onto Robert's possession, and they too have been in possession since 1960 of the property to the fence-line, which amounted to fifty-five years of possession at the time of trial. Even if the 1975 date of death is used, the plaintiffs had possessed the property for forty years at the time of trial. Thus, they have proved acquisitive prescription of thirty years under the law.

### *Applicable Law*

The applicable law states: "The boundary may be fixed upon the demand of an owner or of one who possesses as owner. It may also be fixed upon the demand of a usufructuary but it is not binding upon the naked owner unless he has been made a party to the proceeding." La.Civ.Code art. 786. "Ownership and other real rights in immovables may be acquired by the prescription of thirty years without the need of just title or possession in good faith." La.Civ.Code art. 3486. "When both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author preference shall be given to the more ancient title." La.Civ.Code art. 793. "For purposes of acquisitive prescription without title, possession extends only to that which has been actually possessed." La.Civ.Code art. 3487. "When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title

10

called for, the boundary shall be fixed along these bounds." La.Civ.Code art. 794.

Article 794 Revision Comments provide in pertinent part:

>       (a) This provision is based on Article 852 of the Louisiana Civil Code of 1870.  It does not change the law.  Articles 846, 847, and 851 of the Louisiana Civil Code of 1870 indicate that acquisitive prescription takes precedence over claims based on titles.  The first sentence of Article 794 is an expedient for the avoidance of repetitious statements.

>       (b) According to Louisiana jurisprudence, prescription accrues under Article 852 of the Civil Code even if there is no juridical link among the possessors. *Opdenwyer v. Brown*, 155 La. 617, 99 So. 482 (1924); *Ponder v. Fussell*, 180 So.2d 413 (La.App.1st Cir. 1965).

>       (c) According to Article 3693 of the Louisiana Code of Civil Procedure, "Title prescriptions may be pled in boundary actions, and boundary prescriptions in title suits." *Ledoux v. Waterbury*, 292 So.2d 485 (La.1974).

Specifically, La.Civ.Code art. 3693, addressing evidence and judgment, states:  "After considering the evidence, including the testimony and exhibits of a surveyor or other expert appointed by the court or by a party, the court shall render judgment fixing the boundary between the contiguous lands in accordance with the ownership or possession of the parties."

"The court shall fix the boundary according to the ownership of the parties; if neither party proves ownership, the boundary shall be fixed according to limits established by possession." La.Civ.Code art. 792.  "To acquire possession, one must intend to possess as owner and must take corporeal possession of the thing." La.Civ.Code art. 3424.  "Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing." La.Civ.Code art. 3425.  "One is presumed to intend to possess as owner unless he began to possess in the name of and for another." La.Civ.Code art. 3427.  "Once acquired, possession is retained

11

by the intent to possess as owner even if the possessor ceases to possess corporeally. This is civil possession." La.Civ.Code art. 3431. "The intent to retain possession is presumed unless there is clear proof of a contrary intention." La.Civ.Code art. 3432. "Possession is lost when the possessor manifests his intention to abandon it or when he is evicted by another by force or usurpation." La.Civ.Code art. 3433.

"Immediately at the death of the decedent, universal successors acquire ownership of the estate and particular successors acquire ownership of the things bequeathed to them." La.Civ.Code art. 935. "Prior to the qualification of a succession representative only a universal successor may represent the decedent with respect to the heritable rights and obligations of the decedent." *Id.* The Revision Comments to Article 935 provide in pertinent part:

> (d) As under previous law, the decedent's possession is transmitted to the universal successors with all of its defects as well as its advantages. La. Civil Code Article 943 (1870). They may institute all actions that the decedent could have brought unless the estate is under administration, in which case the succession representative is the proper party plaintiff or defendant and the successors need not be joined. La. Code Civil Proc. Articles 685, 734.

> . . . .

> (h) "Universal Successors" is a term of art defined in Article 3506(28) to include heirs by intestacy and general and universal legatees.

"The possession of the decedent is transferred to his successors, whether testate or intestate, and if testate, whether particular, general, or universal legatees." La.Civ.Code art. 936. "A universal successor continues the possession of the decedent with all its advantages and defects, and with no alteration in the nature of the possession." *Id.* Article 936's Revision Comment (a) provides:

"The transfer of possession that occurs under this Article is consistent with the provisions of Civil Code Article 3441. See Civil Code Article 3441 and the Comments thereunder; see also Civil Code Article 3442. The possession of the successor has the same attributes as the possession of the deceased."

"Prior to the qualification of a succession representative, a successor may exercise rights of ownership with respect to his interests in a thing of the estate as well as his interest in the estate as a whole." La.Civ.Code art. 938(A). Article 938's Revision Comment (a) provides, "This Article recognizes the ownership of estate property enjoyed by a successor prior to a formal judgment of possession, and affords a basis for his binding acts with respect to his own interest."

"Possession is transferable by universal title or by particular title." La.Civ.Code art. 3441. Article 3441's Revision Comment (b) provides:

> Possession is not interrupted by the death of the possessor. The possession of the deceased is continued by his universal successor, such as an heir, universal legatee, or legatee under universal title. A particular legatee is placed in possession by the universal successor of the deceased. The possession of the deceased is tacked to the possession of the universal successor, and the possession of the latter to that of the particular legatee. Thus, there is no interruption of possession when a possessor dies.

"The possession of the transferor is tacked to that of the transferee if there has been no interruption of possession." La.Civ.Code art. 3442. Article 3442's Revision Comments provide in pertinent part:

> (b) In case of universal succession, the possession of the successor is tacked to the possession of the deceased[.]
>
> . . . .

(d) Tacking of possession presupposes a juridical link. This link may arise through universal succession or particular succession. Despite the nonexistence of a juridical link, tacking is permitted in boundary actions within the limits of Article 794 of the Civil Code, as amended by Acts 1977, No. 169.

(e) An author is a person from whom the possessor has derived his right. Thus, the word "author" has the same meaning as ancestor in title. The possessor may have acquired his right from the author by universal or by particular title, onerous or gratuitous. The possession of the heir may be tacked to that of the deceased, and the possession of the buyer to that of the seller.

Based upon the foregoing, even though Mary and Donald O'Neal did not open a succession after their father died, and since no succession representative was ever named, Mary and Donald as the heirs and universal successors, acquired ownership of the property upon Robert's death. Since possession was never interrupted, their possession tacked to their father's, and undisputed testimony revealed that their 55-year possession included the 55.00 titled acres plus the small portion of land that extended to the fence-line. However, due to erroneous findings at trial, Mary and Donald O'Neal, and Tommy and Julie McClure, were not allowed to elicit testimony sufficient to mark the boundaries created by the fence.

### *Erroneous Findings and Limitations Imposed by the Trial Court*

The trial court made numerous findings during the trial that erroneously limited the plaintiffs' attorney regarding the testimony that she could elicit from the witnesses. The trial court's comments during trial and during the hearing on the motion for new trial indicate an erroneous application of the law in reaching both judgments in favor of the defendant.

14

*Knowledge or Consent*

The trial court indicated there was no evidence that the defendant or his ancestors in title knew that Robert O'Neal and his successors were claiming land to the fence-line. However, there is no requirement of knowledge or mutual consent in proving possession of thirty years. In discussing Article 784's predecessor, La.Civ.Code art. 852, the Louisiana Supreme Court distinguished between the requirements of ten years acquisitive prescription and thirty years acquisitive prescription:

> [O]ne who has maintained uninterrupted possession of property within existing visible bounds during thirty years may retain the quantity so possessed by him though it be beyond and more than called for by his title. This is the possession that is essential to bring this article into operation, irrespective of the good or bad faith on the part of the possessor. There is nothing in the provisions of LSA-C.C. Art. 852 which demands the element of mutual consent of the parties. Its provisions clearly provide that possession of surplus land beyond one's title shall entitle him to retain the same once his possession has continued uninterrupted within visible bounds for a period of thirty years.

*Sessum v. Hemperley*, 233 La. 444, 96 So.2d 832, 843 (1957). Thus, while mutual consent was needed to prove acquisitive prescription of ten years, proving acquisitive prescription of thirty years does not require good faith or mutual consent. *Id.*

Moreover, even where a disputed strip of land is not described in an intervening deed, if the possessor never at any pertinent time relinquished his possession of the property, the plea of prescription must be sustained. *Sabine Lumber Co. v. Garcia*, 110 So.2d 878 (La.App. 2 Cir. 1959). In *Garcia*, the court found that enclosure of any of the adjoining property by a possessor's fence "is of sufficient duration without interruption to sustain the plea of prescription," the

15

property, even though described in the adversary's title, which lies on the other side of that fence has been acquired by the possessor, and "must be so recognized by the court." *Id*. at 871.

***Limitations on Testimony***

While the trial court attempted to allow relevant testimony, ultimately the court sustained objections that it should have overruled. For example, during the defendant's cross-examination of Tommy McClure, counsel for the defendant asked questions regarding the 1908 survey plat but refused to show Mr. McClure the plat. Then defense counsel actually *told* Mr. McClure where Highway 28 was on the plat, though it is not on the plat, and when counsel for Mr. McClure rebutted on the issue, defense counsel argued that it was outside of cross and denied raising the issue of the location of Highway 28. When Mr. McClure's counsel tried to have him draw the location of Highway 28 on the plat in relation to the actual boundary created by the Public Road, she was prevented from doing so, as the trial court finally agreed with defense counsel that the issue was beyond cross. This was error, as seen in the following colloquy (emphasis added).

BY [DEFENSE COUNSEL] MR. ELLIOT:

Q. Have you seen this old plat which has been marked at Exhibit P-1?

A. I can't see it from there.

Q. All right.

A. Well, I can't get it straight. Where's 28?

*Q. Well, it's in this area here.*

Thus, defense counsel tried to *tell* Mr. McClure where Highway 28 was on the plat, but in fact, the 1908 survey plat does not show Highway 28 at all.

The area that defense counsel was pointing to is labeled "Public Road" on the plat.

Defense counsel continued the cross.

> MR. ELLIOTT: *So on this map, it shows the David O'Neal property on the other side of the branch. You can call it creek.*
>
> A. Right.
>
> Q. *Twenty point seventy-three acres, right?*
>
> A. *Yeah. Correct. Over there. Yeah.*
>
> . . . .
>
> Q. *Okay. And the property we're talking about here, it's been described as being about two and a half to three acres.* And this act of donation, I see a twenty acre tract, a thirty-five acre tract, and a forty acre tract.
>
> A. If you'll bring that map back up and I can show you how the lines run there.
>
> Q. No, no. I'm not asking you that. I'm asking you about this act of donation that you –
>
> . . . .
>
> THE COURT: Hold on, sir. If you let him look at the document, then he can either say it's – if that's what it's in or not.
>
> MR. ELLIOTT: Well, I'll be glad to let him look at it. It wasn't a trick question. I was just –
>
> THE COURT: Well, no. I just want him to know what he's testifying to if you want him to testify to something that's in a document.
>
> . . . .
>
> Q. *But I don't see a tract that's two and a half to three acres.*
>
> A. All right. Well, if you bring the map, I'll be glad to show you where.

Q. Sir that – I'm not here to help you. You're on the other side.

A. *I'm trying to get to the truth. It's right there –*

On re-examination by Mr. McClure's counsel, the following exchanges took place:

Q. Mr. Elliott had presented you a map.

A. Correct. Yeah.

Q. Do you want to show us where the property is in question? Can you draw that on there?

A. Okay. This is what's in question right here.

MR. ELLIOTT: Are we looking at P-1?

[PLAINTIFFS' COUNSEL] MS. MCCLURE: The nineteen oh-eight – yeah. P-1.

MR. MCCLURE: PB1-201. All right. This right here is what's in question.

MS. MCCLURE: And he had asked you about the public road. Where is 28.

A. Twenty-eight would be up here.

Q. Right. Okay

MR. ELLIOTT: Lack of foundation. He's not qualified to testify to that.

MS. MCCLURE: He – I'm following up on his –

MR. MCCLURE: I know where 28 is. I drive it.

THE COURT: Hold on, Mr. McClure.

MS. MCCLURE: He had asked him about the public road. I'm –

THE COURT: Your objection, Mr. Elliott?

. . . .

18

MR. ELLIOTT: *Your Honor, we went round and round with Mr. Couvillion* the land appraiser and there was - I thought we concluded that the road is the road is the road. *He never testified that Highway 28 was in a different place than the road that's on that map. There's no testimony to that. So now, this lay witness certainly is less qualified to come in and testify that the road that's shown on that map is not the same as Highway 28.*

THE COURT: I believe he can testify based upon what his perception is of the map in regards to what he thinks is out –

MR. ELLIOTT: Well, then we're going to need to lay a foundation about his knowledge of the previous road, the current road, whether there was any expropriation. I mean, I don't – *there's been no link that says - and we had the guy in here that could have done it - to say that road is not the same as Highway 28.*

. . . .

MR. ELLIOTT: So she's going beyond what I covered in cross on her re-direct.

THE COURT: Right.

In reality, defense counsel did not ask where Highway 28 was; rather, he *told* Mr. McClure where Highway 28 was. Defense counsel clearly asked whether Mr. McClure had seen the plat; he apparently held up the plat from a distance and when Mr. McClure could not find Highway 28, Mr. McClure asked where 28 was, and defense counsel then said, "Well, it's in this area here." Thus, defense counsel did more than ask the question; he *answered* the question, erroneously, knowing that Highway 28 was not shown or labeled on the plat. He then misrepresented to the court that he had not brought up the plat, or Highway 28, or the disputed acreage during his cross-examination of Mr. McClure. Defense counsel then mischaracterized to the trial court the earlier testimony of Mr. Couvillion, telling the court that there had been no testimony from Mr. Couvillion

19

saying that the Public Road and Highway 28 were not the same, where, in reality, Mr. Couvillion stated that repeatedly in his testimony, as fully shown above. The trial court accepted defense counsel's erroneous re-capitulation of the testimony throughout the trial and precluded admissible testimony as a result.

In particular, Mr. Couvillion tried repeatedly to describe the fence in question and the location of the land inside the fence. But because his survey was not timely, and not admitted, he was also not allowed to testify *in person*, as to where the fence or the disputed property were located in relation to the 1908 plat that *was* admitted into evidence. He was repeatedly stopped each time he neared the pertinent testimony, though he had been named as an expert months before trial and had been accepted by the court at trial as an expert surveyor. The trial court repeatedly agreed to most of the ill-founded objections of the defense counsel.

### *Reasons for Judgment and Judgment*

The trial court's additional errors are revealed in its reasons for judgment. Therein the trial court stated (emphasis added):

> While the witnesses testified that the fence was the boundary line and was always considered the boundary line since it was built, there was no testimony to the effect that the defendant and defendant's ancestors in title *knew* that the plaintiffs or their ancestors were possessing a small portion of defendant's land as owners and in a fashion that is adverse and hostile to the defendants' record ownership.
>
> There is *no evidence* in the record *of the specific location of the fence* or what it actually encompasses. The *evidence* at trial *established* that the *fence was placed there to run cattle* and was *not placed as a boundary marker*. Mr. Newcomb is the record title owner of the land and the *legal boundaries of his property are not in dispute.*

As shown above, the undisputed testimony of Mary and Donald O'Neal and Tommy McClure show that there was open, continuous, uninterrupted possession by the plaintiffs of the land to the fence-line. Donald O'Neal and Tommy McClure testified that the fence was the boundary, not just put there for cattle. Both witnesses testified as to the location of the fence, as did the surveyor, Jared Couvillion, though he was prevented from describing the location with sufficient detail. The above discussed law shows no requirement that the adverse owner had to give consent or even have knowledge that a portion of their land was being possessed by others as owners.

The trial court cited only *Grantham v. Gaddis*, 14-558 (La.App. 3 Cir. 12/10/14), 158 So.3d 51, *writ denied*, 15-387 (La. 5/22/15), 170 So.3d 984, in support of its finding. However, *Grantham* does not support the trial court's finding or the defendant's position. There, the plaintiff had moved to Texas in 1949, while the defendants had the longer use and occupancy of the property, the reverse of the facts in the present case. Here, there was no testimony by Mr. Newcomb, who had practically nothing to say at trial, regarding his use of the property or that of his ancestors in title. Further, in *Grantham*, the court stated that the defendant's "abstracts of title to the subject properties have been placed in evidence and are not in dispute." *Id*. at 54-55. In this case, the few documents admitted into evidence indicate that no title searches were done, and Mr. Newcomb's title is definitely in dispute in this case. The *Grantham* court cited the law we have already discussed. However, as shown above, the plaintiffs in this case did prove uninterrupted possession of the land to the fence-line since 1960. They were just not allowed to mark the fence-line on the survey plat.

21

While the plaintiffs were not allowed to elicit testimony sufficient to mark the boundaries created by the fence, the trial court erred in setting the boundaries according to Newcomb's title. In addition to its reasons for judgment, the trial court's judgment also stated that "judgment is entered in favor of the defendant, Ronnie Newcomb, as Ronnie Newcomb is the record title owner of the land and legal boundaries in his title," thereby setting the boundaries according to Newcomb's 2015 title. However, Newcomb's title does not comport with that of his ancestor in title, Leonard O'Neal.

***Newcomb's Title***

The description of the land sold by Joseph A. O'Neal to Leonard O'Neal in 1936 reads (emphasis added):

> A certain piece, parcel or tract [of] land, being, lying and situated in the Pariah of Rapides, and State of Louisiana, and d[e]scribed as: That part of the S.W. ¼ of the N.E. ¼ of Sec. 10 T.5 N. R. 3 E. lying South of the Public Road and West of the North branch of Bayou Lemontine[.] Also that part of Sec. 10 T. 5 N. R. 3 E., lying West of the Branch of Bayou Lemontine, and North of the Bayou Lemontine, containing in all twenty (20-73) and seventy three tents [sic] acres more or less, being the same property acquired by vendor from Dave O'Neal as per deed recorded in Conveyance Book xx 110-127, at the Rapides Parish Court House Clerk of Court Office, Together with all building and improvements thereon. *Also new d[e]scription of the same property, being six and one half (6½) chains South of Highway No. 57* being a part of S.W. ¼ of the North East ¼ in Sec. 10 T. 5 N. R. 3 E. Bounded on the East by North Lemontine Branch[,] and on the south by West prong of the Lemontine branch, and on the West by property of Peter Sanson [] as above stated[] being twenty acres (20-73) and seventy three tents [sic][.]

By contrast, the description of the same land in Ronnie Newcomb's July 7, 2015 title reads (emphasis added):

A certain piece, parcel or tract of land, together with all improvements thereon and all rights, ways and privileges thereunto appertaining, being, lying and situated in Section 10, Township 5 North, Range 3 East, Rapides Parish, Louisiana, being part of the Northwest Quarter of the Southeast Quarter (NW 1/4 of the SE 1/4) and part of the Southwest Quarter of the Northeast Quarter (SW 1/4 of NE 1/4) of said Section 10, and being further described as *fronting 6.5 chains on the south side of the public road formerly known as Highway No. 57 and now known as Highway 28 East* bounded on the east by the North Branch of Bayou Lemontine, on the south by the west prong of the North Lemontine Branch, and on the west by property now or formerly belonging to Pete Sanson, said western boundary also being the north-south mid-section line of the aforesaid Section 10, containing 20.73 acres[] being the same property acquired by Leonard L. O'Neal from Joseph A. O'Neal by acts recorded at Conveyance Book 209, Pages 357 and 483, records of Rapides Parish, Louisiana; and by Act of Donation recorded on November 5, 1980 under Original entry No. 728450; records of Rapides Parish Louisiana.

The above described property having a municipal address of 24 L. Alwell Road, Deville, Louisiana 71328.

Being the same property acquired by Dusty Adam Gardner in two acquisitions, (1) Cash Sale from Janet Alwell Arias and David Louis Alwell, recorded September 5, 2012 in Conveyance Book 1926, Page 729, records of Rapides Parish, Louisiana, and (2) from Kristin Lani Hinman Garder by Voluntary Community Property Partition, recorded June 23, 2014 in Conveyance Book 1984, Page 917, all records of Rapides Parish, Louisiana.

Not only does Newcomb's title change the boundary line from the "Public Road" to state Highway 28, it changes the boundary from being 6.5 chains[2] "south" of Highway 28, to a boundary "fronting 6.5 chains on the south side" of Highway 28. While Newcomb's 2015 title professes to describe the same 20.73 acres that Joseph O'Neal sold to Leonard O'Neal in 1936, the newer title changes

---

[2]One "chain" is a land measurement equal to 66 feet. Black's Law Dictionary, Sixth Edition, St. Paul, Minn. West Publishing Co. 1990. Thus, 6.5 chains is equal to 429 feet.

the description.  As discussed above, Mr. Couvillion testified repeatedly that the Public Road represented by a dotted line on the 1908 survey plat was a buggy axle road, and was not the same as Highway 57 or Highway 28.  He further stated:

> THE COURT:  Just so I'll know when I get it, which one are you talking about?
>
> [PLAINTIFFS' COUNSEL]:  This public road right here.
>
> THE COURT:  Kind of the dotted line there?
>
> [PLAINTIFFS' COUNSEL]:  Yes.  It's the dotted line on the right side of the survey.
>
> THE COURT:  Okay.  Go ahead.
>
> [PLAINTIFFS' COUNSEL]:  And that's important when distinguishing the lines for the property descriptions, correct?
>
> A.  Yes.
>
> Q.  And can you tell me what the importance is of that?
>
> A.   The importance is of that line is that when that surveyor had performed that survey in nineteen oh-eight, he was demarcating the north boundary of what was David O'Neal's property being the 20.73 acre tract.
>
> Q.  Okay.  So that was a boundary line on that 20.73 acre tract?
>
> A.  Yes
>
> . . . .
>
> A.  The description reads, also new description of same property being six and one-half chains south of Highway Number 57.
>
> Q.   Okay.   So the property when Leonard O'Neal received the property, the property does not front on Highway 28, correct?
>
> A.  Correct.
>
> Q.  The property is 6.5 chains off of Highway 28?

A. Correct.

Throughout Mr. Couvillion's testimony, defense counsel objected and interrupted the expert repeatedly when he testified regarding titles and boundary descriptions in the deeds, which were clearly in the purview of a surveyor, and clearly allowed by law in a boundary dispute. The law is clear: "When the parties trace their titles to a common author preference shall be given to the more ancient title." La.Civ.Code art. 793. The trial court erred in relying on Newcomb's title to set the boundaries.

Also in evidence is a title wherein, on June 11, 2004, Newcomb purchased a smaller, triangular-shaped tract of land for $3,000.00 from Mary and Donald O'Neal. It appears that the trial court may have believed that this triangular piece of land was part of the acreage in dispute. But that tract of land is in a completely different Quarter of Section 10 and does not adjoin the Quarters in any of the descriptions shown above. More specifically, the description of the property sold to Newcomb in 2004 states as follows (emphasis added):

> All of the ***Southwest Quarter of the Northwest Quarter*** of Section 10, Township 5 North, Range 3 East, that lies North of the right-of-way of Louisiana Highway 28 the property being conveyed herein being triangular in shape and being bounded on the West by O'Neal Road, on the North by property currently owned by Vendees and on the South by Louisiana Highway 28.

All of the land above is in the Southwest Quarter of the "**Northwest**" Quarter of Section 10, while the acreage in dispute around the Public Road is in the Southwest Quarter of the "**Northeast**" Quarter of Section 10. The triangular-shaped acreage purchased by Newcomb in 2004 is separated—by forty acres—from the land where the fence is located. That is, traveling west from the Meridian marking the western border of the land in dispute, one would have to travel over

the entire Southeast Quarter of the Northwest Quarter of Section 10 before getting to the Southwest Quarter of the Northwest Quarter. Thus, the land purchased by Newcomb in 2004 is separated from the land purchased by Newcomb in 2015 by a full quarter of a quarter, or forty acres. The land purchased in 2004 appears to have nothing to do with the small portion now in dispute.

*Motion for New Trial*

In their motion for a new trial, the plaintiffs asserted that a new trial should be granted because the judgment to set the boundaries according to Newcomb's title was contrary to the law and the evidence pursuant to La.Code Civ.P. art. 1972(1). Article 1972 provides in pertinent part as follows:

> A new trial shall be granted, upon contradictory motion of any party, in the following cases:
>
> (1) When the verdict or judgment appears clearly contrary to the law and the evidence.
>
> (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

While the plaintiffs clearly brought their motion for a new trial under Article 1972(1), based upon the judgment's having been contrary to law and evidence, the trial court denied the motion under Article 1972(2), a failure to present new evidence that was unavailable at the time of trial. At the end of the hearing on the motion for a new trial, the trial court stated his findings as follows:

> This is a motion for a new trial. Articles 1971 and 1972 of the Code of Civil Procedure, particularly Article 1972, Section A(1), where it talks about the contrary to law in evidence. I am denying the motion for new trial. I believe the action is a boundary action where it needs to be set. ***I don't see any*** - where there would be any ***evidence that should not have been admitted already in the trial that comes to light.*** The law provides that the person to prove boundary action has that burden to prove, and I do not see where that burden was met.

26

*There's no new evidence that I can see in regards to the matter* . . . .
*So, I will deny the motion for a new trial* at the plaintiff's cost.

Revision Comment (d) to Articles 1971, 1972, and1973, provides in pertinent part: "Although the trial judge has much discretion regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court's ruling aside, or grant a new trial when timely applied for."

We find that the trial court abused its discretion in denying the plaintiffs' motion for new trial where, as discussed at length above, the judgment was contrary to the law and the evidence at trial. Accordingly, we remand this matter to the trial court with instructions to conduct a new trial consistent with the law and findings articulated in this opinion. More specifically, while we find that the plaintiffs proved thirty years acquisitive prescription, because of the erroneous limitations on their testimony and the testimony of Mr. Couvillion, there is not sufficient detail to delineate the boundary line proved by the possession. Thus, the trial court is ordered to admit any evidence necessary to fix the boundary proved by the plaintiffs' possession to the fence-line, including Mr. Couvillion's survey, and any new plat required to depict the newly established boundary.

Louisiana Civil Code Article 2089, entitled "Description required of immovable property affected by judgments or decrees," states: "All judgments and decrees which affect title to immovable property shall describe with particularity the immovable property affected." Likewise, La.Code Civ.P. art. 1919 states: "All final judgments which affect title to immovable property shall describe the immovable property affected with particularity." La.Code Civ.P. art. 1919. Thus, the trial court's final judgment shall contain a property description of the new

27

boundary. Additionally, the title of Ronnie Newcomb shall be reformed to reflect the new boundaries consistent with this opinion.

V.

**<u>CONCLUSION</u>**

Based upon the foregoing, the trial court's judgment in favor of Ronnie Newcomb dated December 30, 2015, is reversed. Likewise, the trial court's judgment of March 28, 2016, denying a new trial to the plaintiffs, Mary and Donald O'Neal, and Tommy and Julia McClure, is reversed, and a new trial is ordered.

Costs of this appeal are assessed to the defendant, Ronnie Newcomb.

**REVERSED AND REMANDED WITH INSTRUCTIONS**.